UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TERRY EUGENE SEARS,

     Plaintiff,

v.                                                    Case No. 3:15cv370-MCR-CJK

RICHARD SUBASAVAGE,
D. HENDERSON, SCOTTY
LANGFORD, S. COLLINS
TERRY DUDLEY, and
A. BETHEA,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the court on defendants Bethea, Dudley, and Collins' motions to dismiss plaintiff's second amended complaint (docs. 32-34). Plaintiff responded in opposition to the motions (docs. 37, 49). The matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(C). After reviewing the parties' submissions, the undersigned recommends defendants' motions be granted.

## BACKGROUND

Plaintiff is an inmate of the Florida Department of Corrections ("FDOC"), currently confined at Century Correctional Institute. In the second amended

complaint, plaintiff names as defendants 6 individuals currently or formerly employed at Blackwater River Correctional Facility ("BRCF") – Assistant Warden Richard Subasavage, Warden Terry Dudley, Inspector D. Henderson, Captain Scotty Langford, Sergeant Sam Collins, and Officer A. Bethea.[1]

According to plaintiff, upon arriving at BRCF on October 25, 2011, he "noticed an outbreak of gang-activity in the dormitories and many inmates fell prey to these gangs and w[ere] physically assaulted, sexually assaulted, extorted for money, canteen items, or personal property or w[ere] paying for protection from rival gangs." Doc. 24 at p. 9. On April 4, 2012, gang members confronted plaintiff as he returned from the canteen, demanding food. Plaintiff complied with the demands and "gave them food items." *Id.* The inmates continued to demand food items each week and, eventually, plaintiff "stopped giving them [his] canteen and [he] became an enemy and was being threatened." *Id.*

On September 18, 2012, plaintiff "filed a grievance and hand-delivered it to Asst. Warden, Terry Dudley and complained of gang-activity and the extortion ring operating in E-dormitory." *Id.* Because he was unable to identify the inmates involved, plaintiff "participated in an internal investigation with Asst. Wardens: T. Dudley, Richard Subasavage, Colonel G. English, and the Institution Gang Inspector to gather incriminating evidence." *Id.* From July 20, 2012, to October 24, 2012,

---

[1] Plaintiff incorrectly identifies defendant Rolando Bethea as "A. Bethea."

Case No. 3:15cv370-MCR-CJK

"evidence was collected of the gang-activities." *Id.* Specifically, "[o]n October 16, 2012, at 7:48, inside E-dorm corridors extortion payments to some gang members was caught on the camera-system." *Id.* "And a list of room numbers where documented gang members was housed was provided to supervisory officials, but nothing was being done to stop gang-activity." *Id.* Nevertheless, "[t]he Institution Gang Inspector was arrested and escorted off the property for being affiliated with certain gangs." *Id.*

On October 28, 2012, plaintiff filed an emergency grievance with GEO Group, Inc. ("GEO") "concerning gang members operating extortion rings and nothing is being done about it."[2] Doc. 24 at p. 10. Plaintiff says the grievance "created a wave of retaliation from GEO prison officials." *Id.* In particular, plaintiff says Dudley confronted him and said, "you fucked me on this . . . ." *Id.* Plaintiff also says prison officials labeled him "a snitch and a homosexual and [his] complicity with the investigation was leaked and compromised." *Id.*

Although plaintiff said nothing was being done about gang activity, it appears at least some gang members were arrested. Indeed, plaintiff states "[t]he gang members who was arrested was released from confinement and rumors began to circulate around the facility." *Id.* Plaintiff began receiving "threatening messages

---

[2] GEO is a private entity that contracts with the State of Florida to perform certain correctional functions.

from Zoe Pound, Vice Lords, Gangster Disciples, and Crips." *Id.* He also was "exposed to inmate retribution as a result of the grievances filed against GEO prison officials." *Id.* In September 2012, plaintiff had 4 "separate arguments on the recreation yard with different gang members." *Id.*

"On September 22, 2012, Inmate Donald Isaiah #K62542 was released from confinement and housed with [plaintiff] in E-dorm." *Id.* According to plaintiff, Isaiah is a member of Gangster Disciples and "demanded [he] make extortion payments or suffer the consequences." *Id.* Shortly thereafter, plaintiff "went to the Assistant Warden's Office and requested a room change." *Id.* Subasavage denied the request, stating he "don't like snitches and don't have plans to accommodate a snitch!" *Id.* Plaintiff "requested 'protective management' until the investigation was complete," but that request was denied as well because the investigation was closed. *Id.* Plaintiff purportedly began receiving "more threatening messages from several gang members and . . . wrote Inmate Requests to Colonel G. English to move Inmate Donald Isaiah to another room or dormitory and [his] request was denied." *Id.* at p. 11.

"On November 8, 2012, at 8:25 pm, [plaintiff] returned from the canteen and several gang members entered [his] room and started threatening [him]. [He] was punched in the eye, side of [the] face, and back of [the] head; [he] was hit in the head with a sock full of batteries; [he] was kicked in [the] chest, and [his] roommate,

Donald Isaiah stole canteen items." *Id.* Plaintiff maintains "[s]upervisory officials undermined [his] allegations of extortion and assault and charged [him] with fighting [his] roommate." *Id.* At the disciplinary hearing on the charge, plaintiff "called ten (10) witnesses and the DVR camera system and the investigation was circumvented and [he] was found guilty of 2-4 fighting." *Id.*

"On or about July 8, 2013, [plaintiff] was released from confinement and assigned to E-dorm," where he was housed alone. *Id.* Approximately 1 month later, "a Haitian inmate moved in [plaintiff's] room . . . and [plaintiff] discovered that he was a gang member of Zoe Pound." *Id.* Plaintiff "informed Sergeant S. Collins and he called Captain S. Langford who argued there are several known gang members in E-6 quad." *Id.* Plaintiff apparently requested a room change, which Langford denied.

On August 19, 2013, plaintiff was physically assaulted by his roommate and "another gang member housed in E6-quad." *Id.* Plaintiff "sustained a cut over [his] right eye, a skinned knuckle, a busted lip, a knot on [his] forearm, minor scratches and abrasions, and a sprained thumb." *Id.* Plaintiff informed Langford of the assault, and Langford advised plaintiff needed to identify his attackers. Langford, Moore, Collins, and Cook escorted plaintiff into Quad 6, and plaintiff identified the 2 inmates who assaulted him. Both inmates were arrested.

"On August 22, 2013, at 2:26 pm, Sergeant S. Collins filed a disciplinary report against [plaintiff] for 3-12 possession of contraband." *Id.* at p. 12. "And the two (2) inmates who assaulted [plaintiff] was released from administrative confinement and was not charged with assaulting [plaintiff]." *Id.* In plaintiff's view, "it clearly showed these gang members was in cahoots with GEO prison officials!" *Id.*

Plaintiff was released from disciplinary confinement on or about September 7, 2013, and housed alone in F-dorm. "[S]everal known sexual predators and highly assaultive inmates began making pervertive gestures and advances towards [plaintiff]." *Id.* "From September 10, 2013 to September 12, 2013, these inmates would arouse themselves and expose erected-penises through their pants and would grope themselves while facing [plaintiff]." *Id.* When [plaintiff] confronted them about disrespecting [him], [they] got into heated arguments and [plaintiff] was called a homosexual, a snitch, a queer, a fuck boy, etc." *Id.*

On September 17, plaintiff "filed a grievance concerning this problem." *Id.* The next day, Inspector Henderson interviewed plaintiff. Plaintiff "informed her of the gang-activity in E-dorm and how [he] filed grievances concerning an extortion ring operating in E6-quad." *Id.* Plaintiff further informed Henderson "about the interview with Asst. Warden, Terry Dudley and that [plaintiff] participated in an investigation to expose the gang members and his complicity was compromised."

*Id.* Plaintiff indicated he was "being threatened and targeted by gang members and a transfer would be in [his] best interest." *Id.* at p. 3.

Henderson advised plaintiff she had "never heard of anything about an extortion ring or an outbreak of gang activity." Doc. 24 at p. 13. Plaintiff explained that "Asst. Warden Richard Subasavage, Colonel G. English, Captain Johnson, Captain S. Langford, and Warden Mark Henry [were] well aware of the gang activity because they leaked [plaintiff's] complicity for filing an emergency grievance to the GEO Group, Inc., Corporate Headquarters." *Id.* Henderson clarified she "called [plaintiff] about [his] grievance concerning Prison Rape Elimination Act (PREA) allegations." *Id.* Plaintiff then "informed [Henderson] of the "perverted gestures and advances directed towards [him] and all the name-calling." *Id.* Plaintiff was reassigned to B-dormitory.

Later that month, plaintiff received several sexually threatening messages, one of which "demanded extortion payments to Vice Lords." *Id.* Plaintiff "placed the notes on the dining tables and left them." *Id.* "On or about September 28, 2013, [plaintiff] was sexually threatened on three (3) separate occasions: once, in the rear of the dayroom; once, while entering [his] assigned room; and once, while in the shower." *Id.* Plaintiff "wrote several Inmate Requests to Inspector Henderson and informed her that some known sexual predators and highly assaultive inmates . . . is writing me sexually threatening notes and demanding extortion payments." *Id.*

Henderson never responded.  On October 8, plaintiff "wrote another Inmate Request to Inspector D. Henderson and put it inside the grievance box."  *Id.*  He "never received a response or interview from this particular request."  *Id.*  On October 10, 2013, plaintiff "wrote an Inmate Request to Warden, Mark Henry and informed him of the perverted gestures and notes, and . . . requested a dormitory change and/or a transfer to alleviate these problems."  *Id.* at p. 14.  In response, Warden Henry threatened "disciplinary action against [plaintiff] for making false PREA allegations."  *Id.*

On October 20, 2013, 3 inmates allegedly entered plaintiff's room and demanded sex, stating "'we gonna fuck you and rob you.'"  *Id.*  When plaintiff tried to exit the room, he was "punched in the mouth and face by Inmate, Scott Walker several times, [his] glasses and Koss headphones were broken."  *Id.*  Plaintiff "grabbed Inmate Walker and Inmate Michael Harden groped [plaintiff's] buttocks and . . . pulled [plaintiff's] pants and underwear down."  *Id.*  Plaintiff "pulled [his] pants and underwear up and was severely beatened by three (3) inmates: [he] was punched in the face and jaw, . . . kicked in the chest, . . . side, and . . . back."  *Id.*

Plaintiff "stabbed Inmate, S. Walker in the face, several times, with [his] ink pen . . . and the 'unknown' inmate produced a weapon (lock in a sock) and started hitting [plaintiff] in the back and mid-section."  *Id.*  "Inmate Michael Harden got this weapon and hit [plaintiff] in the head, back, and forearm . . . [Plaintiff's] religious

necklace (chain & cross) was snatched from [his] neck and some canteen items was stolen: [Plaintiff] ran out of the room to escape actual forced intercourse." *Id.*

Plaintiff "was punched, kicked, and beatened with a weapon for twelve (12) minutes." *Id.* at p. 15. He "sustained busted lips on the upper and lower lips (inside [his] mouth) and a busted lip (on the outside) of [his] lower lip; a bruised right forearm; a swollen jaw; skinned both knees; a laceration in [his] head, minor cuts and scratches; a bruised right shoulder; a bleeding nose; and psychological and emotional trauma." *Id.* Plaintiff "pressed the emergency button, several times, and by the time GEO prison officials responded, [plaintiff had] lost consciousness." *Id.* He "was taken to medical in a wheelchair and was bleeding from the head, nose, and mouth." *Id.* He was "assigned to the prison infirmary for three (3) days as a result of this assault to [his] person." *Id.*

Following the alleged assault, "Captain Scotty Langford interviewed [plaintiff] in the medical building" and plaintiff recounted the events. Plaintiff advised Langford he wanted to file PREA complaints against the assailants, two of whom plaintiff was able to identify by name – Scott Walker and Michael Harden. He knew where the third perpetrator was housed.

Captain Langford responded by filing a disciplinary report against plaintiff for aggravated battery or attempted aggravated battery on an inmate. Langford charged Scott Walker with fighting. It appears Michael Harden was not charged, as

plaintiff states Harden was released from administrative confinement with no disciplinary action having been taken against him.  The third assailant, plaintiff maintains, was never arrested.  According to plaintiff, "[s]upervisory officials did not investigate the incident(s) and sought to punish [plaintiff] and did undermine [plaintiff's] PREA allegations and the assault to [plaintiff's] person, in retaliation." *Id.*

Inspector Henderson interviewed plaintiff on October 21, 2013.  Plaintiff "told her, in details, what happened to [him]." *Id.*  He "also told her that supervisory officials at Blackwater River C.F. is trying to get [him] killed and [he] would like to transfer." *Id.*  "Inspector Henderson took a sworn affidavit from [plaintiff] and claims she filed and documented [plaintiff's] PREA complaints against these named inmates;" she also "informed [plaintiff] that Inmate, Michael Harden confessed to her that he hit [plaintiff] in the head with a weapon (lock on a sock) because [plaintiff] stabbed his brother." *Id.* at p. 16.  Plaintiff requested that PREA and robbery charges be filed against the inmates who attacked him.

Plaintiff appeared for a disciplinary hearing on October 29, 2013, on the battery charges.  Plaintiff pled not guilty and again recounted the incident.  Plaintiff requested to call Henderson "as a staff witness to give live testimony of certain facts." *Id.* at p. 17.  The Disciplinary Team denied plaintiff's request but postponed the hearing to obtain a statement from Henderson.  Plaintiff again appeared before

the disciplinary team on October 30; and he again requested to call Henderson as a witness "to clarify some known facts in the case." *Id.* Plaintiff's request was denied because Henderson did not witness the incident. *Id.* Plaintiff was found guilty and placed in segregation for 60 days.

In November 2013, plaintiff filed grievances against Henderson, alleging she failed to investigate the PREA allegations and assault. He also filed a grievance "concerning a conspiratorial plot by GEO Supervisory Officials who are hiring inmates (gang members) to assault other inmates for contraband." *Id.* at p. 18. Henry and Subasavage denied the grievances, finding the allegations had been addressed in prior grievances.

Plaintiff was served on November 25 with a recommendation that he "be placed on Close-Management II status for displaying a pattern of behavior involving acts or threats of violence. On December 5, he appeared for a hearing and was placed on close-management II status for excessive disciplinary reports.

Plaintiff was transferred to Santa Rosa Correctional Institution ("Santa Rosa CI") on January 7, 2014. Before the transfer, says plaintiff, he was "systematically compelled to sign property receipts without inventorying [his] personal property." *Id.* Plaintiff says "Property Room Personnel, A. Bethea declared all my personal property was packed in two (2) bags." *Id.* Although he "requested to be un-handcuffed so [he] could inventory [his] personal property," Bethea refused. *Id.*

When plaintiff arrived at Santa Rosa CI, he "discovered that a large portion of [his] personal property was missing." *Id.* at p. 19. He describes in detail the missing items:

> My chain & crucifix; my Koss headphones; Sony Digital Radio w/ Sony earbuds; Master lock w/ keys; two (2) personal laundry bags; one (1) set of longjohns; fifteen (15) approved magazines; four (4) bags of Maxwell House coffee; two (2) watch batteries; six (6) smoked oysters; two (2) bags of cashew nuts; three (3) African Crown Hair Grease; two (2) Suave Therapy lotion; five (5) Nextel Moisture soaps; four (4) 4-pak of AA batteries; three (3) Mackerals; four (4) lil chub sausages; three (3) Hot Pickles; two (2) Head & Shoulders shampoo; one (1) Aloe and Ginseng shampoo; two (2) Coco-Butter & Shea shampoo; five (5) jalapeno chez squeeze; and two (2) pair of prescription glasses[].

*Id.*

On January 15, 2014, plaintiff "filed an informal grievance concerning this missing property." *Id.* Bethea denied the grievance, stating "'[plaintiff] received all [his] property when [he] departed BRCF.'" *Id.* Plaintiff's grievance also was denied by supervisory officials at Santa Rosa CI "based on the information provided by Officer A. Bethea." *Id.*

Based on the foregoing, plaintiff asserts violations of his First, Eighth, and Fourteenth Amendment rights, alleging retaliation, cruel and inhuman punishment, deliberate indifference/failure to protect, and denial of due process and equal protection. As recompense, plaintiff seeks an unspecified amount of compensatory and punitive damages. Defendants Bethea, Dudley, and Collins have separately

moved to dismiss plaintiff's second amended complaint, arguing plaintiff has failed to state a claim upon which relief can be granted against them.

## LEGAL STANDARD

In considering a motion to dismiss for failure to state a claim, the court reads plaintiff's *pro se* allegations in a liberal fashion, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), accepts all factual allegations in the complaint as true, and evaluates all reasonable inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994). A few exceptions exist to this rule, such as where the facts alleged are internally inconsistent or where they run counter to facts of which the court can take judicial notice. 5B Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1357 (2008). Further, only *well-pleaded* factual allegations are taken as true, and only *reasonable* inferences are drawn in favor of the plaintiff. *See Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir. 1992); *see also Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) ("unwarranted deductions of fact are not admitted as true"). Mere "labels and conclusions" are not accepted as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (noting courts "are not bound to accept as true a legal conclusion couched as a factual allegation"); *Ashcroft v. Iqbal*, 556 U.S. 662,

680-81 (2009) (explaining conclusory allegations are not entitled to a presumption of truth).

As the Supreme Court reiterated in *Iqbal*, although Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." 556 U.S. at 678. A complaint must state a plausible claim for relief, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The mere possibility the defendant acted unlawfully is insufficient to survive dismissal for failure to state a claim. *Id.* The complaint must include "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, or "nudge[] the[] claim[] across the line from conceivable to plausible[.]" *Id.* at 570.

## DISCUSSION

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (*citing Parratt v. Taylor*, 451 U.S. 527, 535 (1981), overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327, 330-331

(1986)).  As set forth above, plaintiff invokes the First, Eighth, and Fourteenth Amendments.

<u>First Amendment Claim</u>

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech."  *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (*citing Thomas v. Evans*, 880 F.2d 1235, 1242 (11th Cir. 1989)).  An inmate is considered to be exercising his First Amendment rights when he files a grievance.  *See O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011) ("It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement.") (internal marks omitted).  To prevail on a First Amendment retaliation claim, plaintiff must establish: "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech."  *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).  Plaintiff has failed to allege facts sufficient to establish a viable First Amendment claim against Bethea, Dudley, or Collins.

Plaintiff does not allege facts that could even plausibly be construed as establishing a First Amendment claim against Bethea. Instead, based on the facts alleged, the only claims plaintiff arguably asserts against Bethea are under the Fourteenth Amendment, for due process and equal protection violations.

With regard to Dudley, plaintiff says that after he filed an emergency grievance with GEO about alleged extortion, Dudley "confronted [him] and argued, 'you fucked me on this.'" *Id.* Dudley's alleged statement, although crude, does not constitute retaliation. Indeed, the statement itself is not retaliatory, and the statement does not evidence retaliation or even a threat of retaliation. Moreover, plaintiff has not identified any adverse action suffered in connection with Dudley's alleged comment. Plaintiff does not allege, for example, that he was deterred from filing grievances as a result of Dudley's comment; in fact, plaintiff filed grievances after Dudley made the alleged comment. *See Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989) (noting verbal taunts alone do not state a constitutional claim ); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008) (holding "allegations of verbal abuse and threats by the prison officers did not state a claim because the [prison officers] never carried out these threats and verbal abuse alone is insufficient to state a constitutional claim."); *Allen v. Stevens*, 3:12cv334-RV-EMT, 2012 WL 4510866, at *2 (N.D. Fla. Sept. 10, 2012) ("It is well established that mere harassment or verbal abuse does not rise to the level of a constitutional

violation."); *Crenshaw v. City of Defuniak Springs,* 891 F. Supp. 1548, 1555 (N.D. Fla. 1995) (holding "verbal harassment and abusive language, while 'unprofessional and inexcusable,' are simply not sufficient to state a constitutional claim under Section 1983").

With respect to Collins, plaintiff alleges he requested a room change in August 2013, after being housed with a Haitian gang member. Plaintiff claims Collins conveyed the request to Langford, who denied it, after which plaintiff was assaulted by his roommate and another member of Zoe Pound. Presumably in connection with the investigation of the assault, Collins filed a disciplinary report against plaintiff for possession of contraband. Plaintiff contends Collins filed the disciplinary report in retaliation for plaintiff's complaint about being housed with gang members.

Plaintiff has the right to complain about the terms of his confinement, such as being housed with gang members, but he does not allege facts sufficient to show a causal relationship between his complaint and Collins' disciplinary report. Doc. 24 at p. 11. The Eleventh Circuit has held that intervening acts of misconduct can break the causal connection between the exercise of free speech and alleged retaliatory conduct. *See e.g., Rosa v. City of Fort Myers*, 297 F. App'x 830 (11th Cir. 2008); *Davis v. U.S.*, 272 F. App'x 863 (11th Cir. 2008). Plaintiff's possession of contraband was an intervening act of misconduct that broke the causal connection

between plaintiff's complaint and Collins' disciplinary report.  Plaintiff thus has failed to state a viable First Amendment claim against Collins.

Eighth Amendment Claim

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (*quoting Farmer v. Brennan*, 511 U.S. 825, 832 (1994)) (alterations and internal quotation marks omitted). Accordingly, prison officials have a duty to protect prisoners from violence at the hands of other prisoners.  *Farmer*, 511 U.S. at 833.  Not every injury suffered by one prisoner at the hands of another, however, translates into constitutional liability for the prison officials responsible for the victim's safety.  *Id.* at 834.  Liability under the Eighth Amendment for failing to prevent an attack from another inmate requires that a correctional official be found to have known and recklessly disregarded "an excessive risk to inmate health or safety."  *Id.* at 837.  The risk "must be an objectively substantial risk of serious harm," *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003) (*citing Farmer*, 511 U.S. at 834, 844-45), one that is beyond mere possibility, *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam). Absent special circumstances, general hostilities exhibited by prisoners do not alone amount to a "substantial risk of serious harm." *See Brown*, 894 F.2d at 1537 (holding that defendants informed of "racial problem" in victim's cell not liable).

With regard to the required state of mind, "there must be at least some allegation of a conscious or callous indifference to [the] prisoner's rights, thus raising the tort to constitutional stature." *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982) (*quoting Wright v. El Paso Cnty. Jail*, 642 F.2d 134, 136 (5th Cir. 1981)). The official must be subjectively aware of the risk, *Cottone*, 326 F.3d at 1358 (*citing Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001)), meaning that he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Whether an officer was aware of a risk of serious harm may be deduced from circumstantial evidence such as the obviousness of the situation confronting the officer. *Farmer*, 511 U.S. at 842-43, 114 S. Ct. at 1981. A mere negligent failure to protect an inmate does not state a claim under § 1983. *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

A viable complaint must also show the prison official responded to the risk in an objectively unreasonable manner. *Cottone*, 326 F.3d at 1358 (*citing Farmer*, 511 U.S. at 834, 844-45); *Marsh*, 268 F.3d at 1027 ("[O]fficials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk."). The officer must have a realistic opportunity to prevent the illegal conduct. *See Ensley v. Soper*, 142 F.3d 1402, 1407-08 (11th Cir. 1998); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986); *Yang v. Hardin*, 37 F.3d

282, 285 (7th Cir. 1994). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Finally, a plaintiff must show the constitutional violation caused the injury. *Cottone*, 326 F.3d at 1359 (*citing Marsh*, 268 F.3d at 1028).

Here, plaintiff alleges he was "exposed to inmate retribution" in the form of extortion, harassment, and attacks by gang members as a result of filing grievances and requesting "protective management." Doc. 24 at p. 10-15. With regard to the instant motions to dismiss, the only defendant against whom plaintiff even arguably asserts an Eighth Amendment claim is Collins, based on plaintiff informing Collins that a gang member had been moved into his room. Plaintiff, however, has failed to plead facts showing Collins had subjective knowledge of the risk of serious harm. Plaintiff does not allege, for example, that he alerted Collins about a specific threat of assault from the Haitian inmate, or any other inmate, or that Collins knew of prior attacks by any such inmate. *See Gooden v. Mormon*, — F. App'x —, 2013 WL 3940054, at *2 (11th Cir. July 31, 2013) (holding that prison official's decision to leave prisoner handcuffed and unsupervised for nearly five minutes in cell during which he was sexually assaulted by another inmate was not deliberately indifferent to a risk of serious harm to the prisoner as required to state a claim for violation of Eighth Amendment, since official did not have subjective knowledge that prisoner

could be seriously harmed, as prisoner had not alerted official about specific threat from any inmates and did not allege that official knew of prior attacks by those inmates); *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) ("The known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference.") (internal quotation marks omitted). And plaintiff acknowledges that once he informed Collins of the situation, Collins brought the matter to Langford's attention in an effort to address plaintiff's concerns. Plaintiff has not alleged that Collins had the authority to take any further action. Taking the allegations of plaintiff's second amended complaint as true and construing them in the light most favorable to plaintiff, therefore, plaintiff fails to state a plausible Eighth Amendment claim against Bethea, Dudley, or Collins.

To the extent plaintiff seeks to hold any defendant liable for the actions of a subordinate, such claim would fail. Indeed, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Harley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted); *Polk Cnty. v. Dodson*, 454 U.S. 312 (1981); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not sufficient to support § 1983 liability." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,

694 n.58 (1979). "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). The Eleventh Circuit, in *Douglas v. Yates*, 535 F.3d 1316 (11th Cir. 2008), set forth the limited circumstances in which a causal connection can be shown sufficient to render a supervisor liable on a § 1983 claim:

> when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so; when the supervisor's improper custom or policy leads to deliberate indifference to constitutional rights; or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Id.* at 1322 (*citing West v. Tillman*, 496 F.3d 1321, 1328-29 (11th Cir. 2007)).

Plaintiff has pled no facts showing a history of widespread abuse, much less that any defendant was -- or even should have been -- aware of such abuse. He also has not alleged any custom or policy that led to deliberate indifference to his constitutional rights. And he has alleged no facts even suggesting any defendant directed anyone else to act unlawfully or knew of a propensity for unlawful conduct and failed to prevent it. Instead, plaintiff makes only conclusory allegations which are not sufficient for a finding of vicarious liability.

<u>Fourteenth Amendment Claim</u>

Plaintiff's Fourteenth Amendment claim meets a similar fate. "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Lane v. Fort Walton Beach Housing Auth.*, 518 F. App'x 904, 910 (11th Cir. 2013) (internal marks omitted). In *Sandin v. Conner*, 515 U.S. 472, 478, 484 (1995), the Supreme Court recognized only 2 instances in which a prisoner may claim a constitutionally protected liberty interest which implicates constitutional due process concerns: (1) when actions of prison officials have the effect of altering the inmate's terms of imprisonment, and (2) where a prison restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

With regard to the deprivation of property claim, plaintiff alleges Bethea deprived him of personal property upon a transfer from disciplinary confinement at BRCF to Santa Rosa CI. Specifically, plaintiff claims Bethea, who worked in the property room, refused to let plaintiff inventory personal property, which later went missing. Doc. 23 at p. 18-19. Deprivations of property resulting from random, unauthorized acts of government officials do not become due process violations when there exist adequate remedies under state law for plaintiff to seek redress for

the deprivation. [3]  *Parratt*, 451 U.S. at 543-44; *Rodriguez-Mora v. Baker*, 792 F.2d 1524, 1527 (11th Cir. 1986).  Here, adequate state law remedies exist, as plaintiff was afforded the opportunity to file grievances and, after exhausting the administrative process, could have filed suit under state law to recover any damages resulting from the alleged loss of property.  *See* Fla. Stat. § 768.28; *Moore v. McLaughlin*, 569 F. App'x 656, 658 (11th Cir. 2014) (holding "a civil cause of action for the wrongful conversion of personal property . . . constitutes a suitable postdeprivation remedy for procedural due process violations")

Moreover, any perceived right to inventory property and be free from restraint for the purpose of inventorying personal property is not protected under the Constitution.  Although inmates may at times be allowed to inventory their personal property, they do not have a right to inventory their property any time they choose.  Plaintiff's interest in having restraints removed and inventorying property must be balanced against the institution's interest in maintaining order and security in the prison and, in this case, the institution's interest prevails.  *See Harris v. Forsyth*, 735 F.2d 1235, 1235 (11th Cir. 1984) (*quoting Sullivan v. Ford*, 609 F.2d 197, 198 (5th Cir. 1980)) (It is "well established that a state has 'a compelling interest in maintaining security and order in its prisons and, to the extent that it furthers this

---

[3] This is equally true whether the deprivation was the result of an intentional or negligent act.  *See Hudson v. Palmer*, 468 U.S. 517 (1984).

interest in reasonable and non-arbitrary ways, property claims by inmates must give way.'"). Accordingly, plaintiff has failed to allege facts sufficient to sustain a Fourteenth Amendment Due Process claim.

Plaintiff also asserts an equal protection violation. Under the Fourteenth Amendment's Equal Protection clause, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. According to the Eleventh Circuit,

> [t]o plead an equal protection claim, a plaintiff must allege that "through state action, similarly situated persons have been treated disparately." *Thigpen v. Bibb County, Ga., Sheriff's Dep't*, 223 F.3d 1231, 1237 (11th Cir.2000), *abrogated on other grounds by National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). The Supreme Court has recognized "class of one" equal protection claims where a plaintiff asserts that he was irrationally discriminated against on an individual basis, rather than as a member of a particular group. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000). A plaintiff can establish a "class of one" claim by showing that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564, 120 S.Ct. at 1074. "To be 'similarly situated,' the comparators must be prima facie identical in all relevant respects." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1264 (11th Cir.2010) (quotation and emphasis omitted).

*Thorne v. Chairperson Fla. Parole Comm'n*, 427 F. App'x 765, 771 (11th Cir. 2011). Plaintiff has not identified any individual whom he contends was similarly

situated to him and treated differently.  Plaintiff thus has failed to plead an equal protection claim.

Accordingly, it is respectfully RECOMMENDED:

1.    That defendant Bethea's motion to dismiss for failure to state a claim (doc. 32) be GRANTED and plaintiff's claims against Bethea DISMISSED.

2.    That defendant Dudley's motion to dismiss for failure to state a claim (doc. 33) be GRANTED and plaintiff's claims against Dudley DISMISSED.

3.    That defendant Collins' motion to dismiss for failure to state a claim (doc. 34) be GRANTED and plaintiff's claims against Collins DISMISSED.

At Pensacola, Florida, this 14th day of August, 2018.

/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the Magistrate Judge and all other parties. A party failing to object to a Magistrate Judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.